UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUDOOS HAMOOD,

     Plaintiff,

                                Case No. 23-cv-10270

v.                             Honorable Linda V. Parker

ARAB COMMUNITY CENTER
FOR ECONOMIC AND SOCIAL
SERVICES (ACCESS),

     Defendant.

_____/

### OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (ECF No. 33) AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF No. 34)

This is a religious discrimination case which arose from Sudoos Hamood's termination by the Arab Community Center for Economic and Social Services ("ACCESS"). Currently before the Court are Plaintiff's Motion for Partial Summary Judgment on her failure to accommodate claims, Counts I and II (ECF No. 33), and Defendant's Motion for Summary Judgment. (ECF No. 34.) For the reasons set forth below, Plaintiff's motion is **DENIED** and Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

Ms. Hamood has a long history with ACCESS and began working for the organization in 2017. In 2021, Ms. Hamood took on a new role at ACCESS and

began working as an English teacher during the COVID-19 pandemic.  Shortly

thereafter, on October 8, 2021, Ms. Hamood's employment with ACCESS was

terminated due to conflict over ACCESS's policy which required English teachers

to show their faces while teaching virtually.

### a.  Ms. Hamood's Belief

Importantly, Ms. Hamood is a practicing Muslim and in March or April of

2020, she began wearing a head covering referred to as a "niqab."[1]  (ECF No. 35-

1, PageID.935.)  At the same time, COVID-19 mask mandates were in effect.  (*Id.*)

Prior to the pandemic, Ms. Hamood did not wear a niqab while working at

ACCESS.  (ECF No. 37, PageID.1797.)

Ms. Hamood asserts that she has a genuine religious belief which requires

her to not show her face to men outside of her family.  (ECF No. 39-3,

PageID.2268.)  To comply with this belief, Ms. Hamood wears a niqab.  However,

Ms. Hamood posed with her face uncovered for the pictures on her 2015-2019 and

2019-2023 ACCESS employee badge and for her 2019-2023 Michigan driver's

license.  (ECF No. 34-5, Page ID.524-525.)  ACCESS employees were under the

impression that Ms. Hamood wore a niqab in lieu of a face mask and Ms. Hamood

said as much to some of her friends.  (ECF No. 35-1, PageID.935.)  Prior to the

---

[1] A niqab is a garment which covers all portions of an individual's head and face except for her
eyes.  It is undisputed that niqabs are worn for religious purposes by some Muslim women.
Documents in the record occasionally refer to Ms. Hamood's niqab as a "veil."

dispute over the camera policy, Ms. Hamood's coworkers at ACCESS were unaware that Ms. Hamood wore the niqab for religious purposes.  (*Id*.)

### b.  Timeline

The dispute between the parties began on September 4, 2021, when Anisa Sahoubah, the director of the youth and education department for ACCESS, sent an email to Grace Irwin, the supervisor of adult and family learning, informing her that all English teachers must keep their cameras on during virtual classes.  (ECF No. 35-1, PageID.908.)  Ms. Sahoubah stated that the policy was implemented to "keep students engaged, and for students to be able to see how words are pronounced/articulated" and the camera policy was standard practice for "every learning institution" of which she was aware.  (ECF No. 34-7, PageID.698.)

That same day, Ms. Irwin informed all the ESL teachers, including Ms. Hamood, of the policy via text message.  (ECF No. 34-9, PageID.793.)   In response, Ms. Hamood questioned why keeping the camera on during class was important.  (*Id.* at PageID.795, 838.)  Ms. Irwin asserted that it was to "keep students engaged, so they can see how words are pronounced and articulated, and so [Ms. Hamood] could use gestures/props."  (*Id.*)  Ms. Hamood explained that she would keep her camera on but would wear a mask because she did not want her students to screenshot her face.  (*Id.*)  Ms. Irwin then asked if Ms. Hamood could establish a policy where students agreed not to take screenshots, and Ms. Hamood

3

responded that she did not trust that all students would comply, and she was uncomfortable with the idea. (*Id.* at PageID.839.)  On September 13, 2021, Ms. Hamood met in person with Ms. Irwin and reiterated her discomfort with the policy but did not specifically identify religion as the basis of her objection. (*Id.* at PageID.804.)

Subsequently, all the ESL teachers, including Ms. Hamood, met with Ms. Irwin and Ms. Sahoubah to discuss the policy. (ECF No. 35-1, PageID.908.) During this meeting, Ms. Hamood asked what the policy would be if someone wore a niqab.  Either Ms. Irwin or Ms. Sahoubah stated that the situation would be different for those who wore a niqab, but that such a discussion was irrelevant as Ms. Hamood was not known to wear one. (ECF No. 34-9, PageID.806, 814, 845; ECF No. 35-1, PageID.944; ECF No. 33-1, PageID.262.)

 On September 22, 2021, Ms. Hamood began teaching with her camera on while wearing a niqab. (*Id.* at PageID.816.)  Ms. Irwin sent an email confirming that Ms. Hamood was required to teach with the camera on and her veil off or ACCESS would move forward with progressive discipline. (*Id.* at PageID.824.) Ms. Hamood then raised a religious objection to teaching with her niqab off while online via email to Ms. Irwin. (*Id.* at PageID.826.)

Subsequently, Mosein Hussein, ACCESS's Director of Human Resources, and Ms. Hamood discussed the policy and her objection.  Mr. Hussein explained

4

that the purpose of the policy was to improve student engagement and having one's face visible was the best practice for teaching English. (ECF No. 35-9, PageID.1108.) Ms. Hamood reiterated her religious objection and stated that she was afraid that men outside of her family would see her if she was unveiled while on zoom, but she was willing to teach with her veil off while in person. (*Id.* at PageID.1112.)

Ultimately, on October 8, 2021, Mr. Hussein, Ms. Sahoubah, and Ms. Irwin met with Ms. Hamood and advised her that she had to remove her niqab while teaching virtually or she would be terminated from employment. Ms. Hamood refused and was subsequently terminated. (ECF No. 34, PageID.301.) ACCESS attempted to identify an alternate position for Ms. Hamood which would allow her to wear a niqab but lacked the funding for such a position. (ECF No. 35-1, PageID.958.)

### c. Educational Best Practices

The parties dispute the impact of viewing a teacher's face on English language acquisition. In support of her position that face veiling does not violate best practices or impair teaching, Ms. Hamood has provided her deposition and the expert opinion of Dr. William Eggington. In contrast, ACCESS has provided the expert opinions of Ms. Anita Linder Caref and Dr. Debra Hardison, in addition to the lay witness opinions of Ms. Sahoubah and Ms. Irwin. ACCESS's witnesses

5

support the proposition that viewing a teacher's face is best practice for English language classes.

Dr. Eggington is a linguist who opined that whatever impact the niqab may have on instruction was "negligible" given the fact that Ms. Hamood's class was taught online and involved teaching grammar and vocabulary at the intermediate level.  (ECF No. 37-10, PageID.2044.)  Dr. Eggington stated that, "all things equal, it's the best model" to teach English with "full facial expression, mouth tongue placement" and that "clear unmuffled vocalization is an optimal way to present language models to a student."  (ECF No. 35-15 at PageID.1652.)  He agreed there was "no disputing Dr. Hardison's conclusion that facial visual cues play an important role in a student's ability to learn."  (ECF No. 37-10, PageID.2052.) However, Dr. Eggington was skeptical of the benefits gained from viewing the teacher's face due to the fact the course was taught online.  (*Id*.)

Ms. Hamood also points to the textbooks used for the ESL course, which she argues did not require her to show her face.  (ECF No. 33-1, PageID.268.) Furthermore, she points out that there is no evidence of student complaints, decrease in enrollment, or direct evidence of impaired student outcomes because of her face veiling.

Dr. Hardison is also a linguist, and she stated that wearing a niqab was less effective based on educational best practices.  She acknowledged that there are

alternative methods of teaching pronunciation, however, they are less desirable than seeing a teacher's face.  (ECF No. 35-12, PageID.1165-1166.)  She opined that without providing full visual information, Ms. Hamood could not meet all of her students' needs. (*Id.* at PageID.1197.)  Ultimately, Dr. Hardison stated that Ms. Hamood was "bound to be less effective based on best practices" if she did not show her face. (*Id.* at PageID.1200.)

Ms. Caref has a master's degree in English/Language and Literacy from The City College of the City University of New York and extensive experience teaching English.  (ECF No. 37-8, PageID.1914.)  Ms. Caref stated that it "is crucial for teachers to model correct pronunciation, using explicit facial expressions and mouth positioning."  (*Id.* at PageID.1918.)  In Ms. Caref's experience teaching English online, she found it essential for a teacher to model pronunciation and show students her face.  (*Id.* at PageID.1921.)

Ms. Irwin's assessment of Ms. Hamood's teaching was based on her general knowledge and approximately ten minutes of observation of Ms. Hamood's class, during which time she made no assessments as to student engagement.  (ECF No. 34-9, PageID.812.)  However, based on her understanding of educational best practices, Ms. Irwin believed it was better to show your face while teaching.  (*Id.* at PageID.813.)  Ms. Sahoubah also believed having cameras on and showing your

7

face while teaching was best practice for English language acquisition.  (ECF No. 35-1, PageID.939, 946, 953-954.)

## II.    STANDARD

Summary judgment pursuant to Rule 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets this burden, "[t]he party opposing the motion must show that 'there is a genuine issue for trial' by pointing to evidence on which 'a reasonable jury could return a verdict' for that party." *Smith v. City of Toledo*, 13 F.4th 508, 514 (6th Cir. 2021) (quoting *Liberty Lobby*, 477 U.S. at 248). The non-movant's evidence generally must be accepted as true and "all justifiable inferences" must be drawn in the non-movant's favor.  *Liberty Lobby*, 477 U.S. at 255.

## III.   ANALYSIS

### A. Failure to Accommodate (Counts I and II)

Ms. Hamood claims that ACCESS failed to accommodate her sincerely held religious belief in violation of Title VII and ELCRA.  She argues she is entitled to summary judgment as ACCESS cannot raise a genuine issue of material fact as to whether it would have suffered an undue hardship by accommodating her.  (ECF No. 33, PageID.238.)  ACCESS conversely argues that there is a question of material fact as to the sincerity of Ms. Hamood's belief and it is entitled to summary judgment in its favor because, regardless, it reasonably accommodated her belief.

#### a.  Prima Facie Case

To prevail in a failure to accommodate claim, Ms. Hamood must show that she: (1) holds a sincere religious belief that conflicts with a job requirement; (2) informed her employer of the conflict; and (3) was discharged or disciplined for failing to comply with the conflicting job requirement.  *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007).

It is undisputed that wearing the niqab to avoid being seen by males outside of an individual's family is a religious belief; it is also undisputed that not all Muslims choose to partake in this practice.  As Ms. Hamood described it, wearing the niqab is "not a must; it's a choice"  (ECF No. 34-6, PageID.595).  The parties

9

also agree that Ms. Hamood was terminated for refusing to remove her niqab. However, ACCESS challenges the sincerity of Ms. Hamood's belief.

"If a plaintiff asserts a belief that is religious on its face, she must then demonstrate that it is 'sincerely held,' not merely a 'pretextual assertion of a religious belief in order to obtain an [accommodation].'" *Speer v. UCOR LLC*, No. 3:22-CV-426, 2024 WL 4370773 at *6 (E.D. Tenn. Oct. 1, 2024) (citing *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 n.28 (2014)). Religious sincerity is a question of fact. It involves a credibility determination which asks if a plaintiff is honest in her belief. *Ackerman v. Washington*, 16 F.4th 170, 181 (6th Cir. 2021). Although sincerity is not a high bar, courts "need not take [plaintiffs] at [their] word" regarding the sincerity of their belief. *Id.*

In assessing sincerity, a factfinder must "determine whether the line drawn by the plaintiff between conduct consistent and inconsistent with her or his religious beliefs reflects an honest conviction." *Id.* To do so, the factfinder looks at a variety of factors such as the plaintiff's "length of adherence, knowledge about the belief system, and the existence of religious literature and teachings supporting the belief." *Id.* A factfinder may also consider a plaintiff's past behavior, including whether they have "wavered in their dedication" to the belief. *Id.*

Given the current record, Ms. Hamood's sincerity is a question of credibility for the jury's determination. *See Payne v. Novartis Pharms. Corp.*, 767 F.3d 526,

530 (6th Cir. 2014) (noting that credibility determinations and drawing inferences from facts are jury functions).  The evidence is not so overwhelming as to justify summary judgment on this element in Ms. Hamood's favor, and the jury must make the ultimate credibility determination.  Consequently, Ms. Hamood's motion for partial summary judgment (ECF No. is 33) is **DENIED**.

For the remaining portions of this opinion, the Court views the facts in the light most favorable to Ms. Hamood and assumes her religious belief is sincere.  It is undisputed that Ms. Hamood informed ACCESS of the conflict and she was discharged due to her refusal to remove the niqab.  Consequently, viewing the facts in the light most favorable to Ms. Hamood, the prima facie elements of a failure to accommodate claim are met and the burden shifts to ACCESS to show that it could not reasonably accommodate her.

### b. Reasonable Accommodation

"Once an employee has established a prima facie case, the employer has the burden 'to show that it could not reasonably accommodate the employee without undue hardship.'"  *Tepper v. Potter*, 505 F.3d 508, 514 (6th Cir. 2007) (quoting *Virts v. Consolidated Freightways Corp.*, 285 F.3d 508, 516 (6th Cir. 2002)).  "The reasonableness of an employer's attempt at accommodation must be determined on a case-by-case basis and is generally a question of fact for the jury, rather than a question of law for the court."  *EEOC v. Robert Bosch Corp.*, 169 Fed. Appx. 942,

944 (6th Cir. 2006).  If the employer offers an accommodation that is reasonable,

"the statutory inquiry is at an end."  *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S.

60, 68 (1986).

ACCESS argues that it reasonably accommodated Ms. Hamood's religious

practice by offering to prohibit students from taking screenshots of the class and

men from viewing the class.  Ms. Hamood argues that there was no

accommodation offered and that ACCESS's proposed accommodation was

insufficient since it was suggested before she informed ACCESS of her religious

objection.  However, she was willing to teach an in person women only class

without her face covering.  The Court finds there is a question of material fact as to

the reasonableness of the proposed accommodation.

In either a virtual or in-person setting there is a remote possibility that a man

will see a woman's face when she is teaching without a face covering.  The success

of that accommodation relies, in part, on a teacher's trust in her students and the

community at large to follow relevant policies.  However, that risk is potentially

higher in a virtual setting where a teacher may not be aware a student has taken a

photo, or a man is present due to the nature of the technology used.  Consequently,

the Court cannot say that as a matter of law the photo policy accommodation was

reasonable.  The adequacy of ACCESS's proposed accommodation remains a

question of fact for the jury.

### c. Undue Hardship

ACCESS further argues that Ms. Hamood's two proposed accommodations would have imposed an undue hardship on ACCESS.  Ms. Hamood's two proposed accommodations were: (1) teaching with her camera off or with her face covered with a niqab or (2) teaching in person with her face uncovered.  Ms. Hamood argues that "whatever impairment might exist due to her wearing of the niqab, that impairment was negligible." (ECF No. 37-10, PageID.2044.)  As ACCESS bears the burden of proof on this issue, it must show "as a matter of law, that any and all accommodations would have imposed an undue hardship." *Adeyeye v. Heartland Sweeteners, LLC*, 721 F.3d 444,  (7th Cir. 2013).  It cannot do so here.

Undue hardship is a fact intensive inquiry, and for "the purpose of religious accommodations, an accommodation poses an undue hardship if it results in substantial increased costs to the employer" in "the overall context of an employer's business."  *Groff v. DeJoy*, 600 U.S. 447, 468 (2023).  The Court must consider "all relevant factors in the case at hand, including the particular accommodations at issue and their practical impact in light of the nature, 'size and operating cost of [an] employer.'"  *Id.* at 470–71.

The Court may also "consider intangible costs like the loss of office efficiency and the safety risk an accommodation can pose to other employees" in

determining if an accommodation poses an undue hardship. *Speer v. UCOR LLC*, No. 3:22-CV-426, 2024 WL 4370773 at *10 (E.D. Tenn. Oct. 1, 2024). "[S]afety considerations are highly relevant in determining whether a proposed accommodation would produce an undue hardship on the employer's business." *Draper v. U.S. Pipe & Foundry Co*., 527 F.2d 515, 521 (6th Cir. 1975); *Brown v. MGM Grand Casino*, No. 2:22-CV-12978, 2024 WL 4819575 at *9 (E.D. Mich. Nov. 18, 2024). Furthermore, the Court must consider all possible accommodations, not just a particular proposed accommodation. *Groff*, 600 U.S. at 473. Additionally, the employer does not necessarily need to prove the costs that it would have incurred if it provided an accommodation; "it is entitled to rely on its projections." *Speer*, 2024 WL 4370773 at *10.

It is also important that this case "arises in an academic context where judicial intervention in any form should be undertaken only with the greatest reluctance." *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 576 (6th Cir. 1988). *See also Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60 (1986); *Regents of Univ. of Michigan v. Ewing*, 474 U.S. 214 (1985). However, courts still generally apply the elements of discrimination claims in academic contexts. *Doherty*, 862 F.2d at 573–75. For example, in *Doherty* the Sixth Circuit substantively analyzed and disposed of Doherty's discrimination claim and reasonable accommodation, only mentioning the degree of deference given to educational institutions when

14

discussing the state law contract claims present in that case. *Id.* at 573–577. Although this is certainly a close call, this is not the case of a court evaluating a school's academic standards for students or the content of a curriculum. Consequently, the Court gives heightened credence to ACCESS's argument on educational issues, particularly regarding the efficacy of teaching while veiled, but this issue is not dispositive.

Contrary to ACCESS's argument, *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753 (6th Cir. 2015) is not precisely on point. The language ACCESS cites from *Ford Motor* is a discussion of the deference granted to employers in identifying the "essential functions" of a job. Unlike other areas of discrimination law, the essential functions test is not directly analogous in the religious discrimination context, as the "essential functions" test is applied to determine if an individual is qualified under 42 U.S.C. § 12111. There is not an exact comparator in the case of religious discrimination, where the Court must assess the hardship placed on an employer under the undue hardship standard outlined in *Groff*.

ACCESS's argument largely focuses on noneconomic factors, specifically educational best practices, safety, and lack of available space to comply with social distancing requirements. ACCESS alleges that seeing a teacher's face is an essential component of teaching language, a fact which Ms. Hamood disputes. Ms. Hamood has produced sufficient evidence in the form of Dr. Eggington's expert

opinion to generate a genuine dispute of material fact on this issue.  The Court cannot say that teaching online with a camera off or while masked would pose an undue hardship as a matter of law, particularly when schools across the country required teachers, including language teachers, to be masked.

In the context of education, a teacher's effectiveness is a critical part of the job and an accommodation which impairs that effectiveness could pose an undue hardship on an employer who seeks to provide the best instruction possible to its students.  However, the Court is also mindful that teachers across the country taught with their faces obscured during the pandemic.  Particularly given the deference courts give academic institutions in making pedagogical choices, the Court cannot definitively say that Ms. Hamood's proposed accommodations would or would not pose an undue hardship to ACCESS.

The Court also cannot find as a matter of law that it would have posed an undue hardship on ACCESS to require classes to be in person.  To comply with social distancing requirements, ACCESS would have had to limit its English classes to nine students per class.  (ECF No. 34, PageID.288.)  Ms. Hamood suggests that ACCESS could have offered multiple class sessions throughout the day with smaller class sizes to accommodate all students.  In the context of the COVID-19 pandemic, courts have held that an employer must show evidence of a materially increased safety risk.  *Brown v. MGM Grand Casino*, No. 2:22-CV-

12978, 2024 WL 4819575 at *8 (E.D. Mich. Nov. 18, 2024).  For example,

employers can point to vaccination rates, the cost of complying with social

distancing requirements, and practices of other employers at the relevant time.

In this case, it is unclear how many students were vaccinated at the time, the

total cost to ACCESS of hosting multiple classes, and if that cost would have been

substantial "in light of the nature, size, and operating cost" of ACCESS.  *Groff*,

600 U.S. at 470–71.  The Court acknowledges that educational institutions had to

make difficult choices in an impossible situation during the pandemic.  However, it

cannot say that as a matter of law ACCESS could not have accommodated Ms.

Hamood without undue hardship.

While the Defendant is not entitled to summary judgment on the issue of

undue hardship, ACCESS has articulated legitimate concerns and identified

specific reasons why the accommodation would have proposed an undue hardship.

Namely, the importance of seeing a teacher's face in language instruction.

Although it very well may be that ACCESS would have suffered an undue

hardship by accommodating Ms. Hamood, ultimately, it is the function of the jury

to determine the weight it should give to ACCESS's assertion that it would have

suffered such a hardship.  *Brown v. MGM Grand Casino*, No. 2:22-CV-12978,

2024 WL 4819575 at *8 (E.D. Mich. Nov. 18, 2024).  Consequently, the Court

**DENIES** ACCESS's motion for summary judgment on the failure to accommodate claims (Counts I and II).

### B. Hostile Work Environment (Counts III and IV)

ACCESS argues that the remaining claims must be dismissed as there is no evidence of: (1) a hostile working environment; (2) that Ms. Hamood was treated differently than any other ESL teacher; or (3) that ACCESS retaliated against Ms. Hamood for making a religious discrimination complaint.

To succeed on a hostile work environment claim under either Title VII or ELCRA, Ms. Hamood must show: (1) she was a member of a protected class; (2) she faced unwelcome harassment; (3) she suffered the harassment because of her religion; (4) the harassment created a work environment that unreasonably interfered with her work performance; and (5) ACCESS was responsible for the harassment. *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999); *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012) (the "ELCRA hostile work environment analysis is identical to Title VII's analysis.")

It is unclear which specific acts Ms. Hamood claims constituted harassment or contributed to a hostile working environment. Most specifically, Ms. Hamood states that statements by ACCESS's employees that they "do not believe" in her sincerely held belief constituted harassment. (ECF No. 39, PageID.2088.)

However, she does not identify specific instances of conduct in her complaint or briefing.

The Court infers that Ms. Hamood is referring to Mr. Hussein's statement during the September 28, 2021 meeting that the niqab was not required by Islam. (See ECF No. 35-9, PageID.1110; ECF No. 1, PageID.9.)  During that conversation, Mr. Hussein briefly described his views on the niqab and hijab before stating that he did not want to discuss religion.  (ECF No. 35-9, PageID.1110.)  It is notable that there is no evidence in the record that any ACCESS employee questioned Ms. Hamood regarding the sincerity of her belief. Furthermore, Ms. Hamood had "no problem" with Mr. Hussein expressing his opinion on the niqab during that conversation.  (ECF No. 39-3, PageID.2250.)  The Court also considers the September 22, 2021, email which stated that Ms. Hamood had to remove her veil and has otherwise searched the record for any evidence of harassment.

Generally, a "hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice.'" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 117 (2002).  Although one act can sometimes support a hostile work environment claim, "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment."

*Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation and quotations omitted). "Thus, occasional offensive utterances do not rise to the level required to create a hostile work environment because, '[t]o hold otherwise would risk changing Title VII into a code of workplace civility.'" *Phillips v. UAW Int'l*, 854 F.3d 323, 327 (6th Cir. 2017) (quoting *Grace v. USCAR*, 521 F.3d 655, 679 (6th Cir. 2008)). To be hostile or abusive, conduct must be extreme. *Hafford v. Seidner*, 183 F.3d 506, 514 (6th Cir. 1999).

The Court examines the totality of the circumstances to determine whether an environment is hostile or abusive. Factors include "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. Not only must the conduct be objectively hostile or abusive, but the victim must also "subjectively perceive the environment to be abusive." *Id.* at 21.

To the extent Ms. Hamood's termination is the basis for her hostile work environment claim, this is insufficient as adverse employment actions like termination are "not in the nature of harassment in the form of intimidation, ridicule, or insult" which are required to support a hostile work environment claim. *See Ogbonna-McGruder v. Austin Peay State Univ.*, No. 21-CV-00506, 2023 WL 3572891, at *9 (M.D. Tenn. May 19, 2023).

20

Reviewing the totality of the circumstances, the Court finds that no reasonably jury could find that Ms. Hamood was subject to harassment or that the harassment unreasonably interfered with her work.  In the process of obtaining a religious accommodation some level of inquiry into the nature of and the sincerity of the employee's belief is reasonably required.  Although having one's religion discussed in a professional setting can undoubtedly be uncomfortable, it does not rise to the level of insult, intimidation, or ridicule sufficient to support a hostile work environment claim in this case.

Even viewing the conduct at issue as harassment, there is no evidence in the record that the conduct was severe or pervasive enough to constitute a change in the terms and conditions of employment.  For example, in *Bourini v. Bridgestone/Firestone N. Am. Tire, LLC*, 136 F. App'x 747 (6th Cir. 2005) the Sixth Circuit found that eight incidents of harassment over five years which included insulting graffiti did not constitute a hostile work environment. *See also Lundy v. Gen. Motors Corp.*, 101 F. App'x 68 (6th Cir. 2004).  Ultimately, a hostile work environment claim is focused on addressing a culture of religious discrimination.  *See Garcimonde-Fisher v. Area203 Mktg., LLC*, 105 F. Supp. 3d 825, 840 (E.D. Tenn. 2015).  There is no evidence of such a culture here.

Consequently, no reasonable jury could find in Ms. Hamood's favor on the hostile work environment claims. For the foregoing reasons, summary judgment is **GRANTED** as to the hostile work environment claims (Counts III and IV).

### C. Disparate Treatment (Counts V and VI)

Ms. Hamood argues that her disparate treatment claims must overcome summary judgment as a "religious practice cannot be a factor in Defendant's employment decisions." (ECF No. 39, PageID.2089.) ACCESS responds that there is no allegation that it treated Ms. Hamood differently than any other ESL teacher.

To succeed on a disparate treatment claim, Ms. Hamood must show that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated differently than similarly situated employees who aren't members of her protected class. *Singleton v. PSA Airlines, Inc*., No. 21-3423, 2022 WL 875869 (6th Cir. Mar. 24, 2022). To be similarly situated, employees must be "similarly situated in all relevant respects." *Tennial v. United Parcel Serv*., 840 F.3d 292, 304 (6th Cir. 2016).

The sole case cited by Ms. Hamood is *E.E.O.C. v. Abercrombie & Fitch Stores, Inc*., 575 U.S. 768 (2015). The Sixth Circuit has long distinguished between failure to accommodate and disparate-treatment claims, and this sorting

22

method survived *Abercrombie*.  *Sturgill v. Am. Red Cross*, 114 F.4th 803, 811 (6th Cir. 2024); *Casciano v. LifeSecure Ins. Co*., No. 23-11149, 2025 WL 274465 at *2 (E.D. Mich. Jan. 22, 2025).  To the extent that this claim is duplicative of the failure to accommodate claim, the Court dismisses the claims as redundant.  *See* Fed. R. Civ. P. 12(f).

Furthermore, Ms. Hamood does not make out a separate disparate treatment case.  In this case, Ms. Hamood has not identified any comparator employees, nor has she identified another employee who has been exempt from the relevant policy.  In her response brief, Ms. Hamood argues that these claims must survive as ACCESS cannot terminate her because of her religion.  This argument seems to conflate a failure to accommodate claim with a disparate treatment claim.  As Ms. Hamood has not shown there is a similarly situated employee, summary judgment is **GRANTED** on the disparate treatment claims (Counts V and VI).

### D. Retaliation (Counts VII and VIII)

Ms. Hamood argues that she has established a case of retaliation as she opposed ACCESS's face covering policy and subsequently suffered an adverse employment action, her termination.  To establish a prima facie retaliation case under both Title VII and ELCRA, Ms. Hamood must show: (1) she engaged in protected activity; (2) this exercise of protected rights was known to ACCESS; (3) ACCESS thereafter took adverse employment action against her; and (4) there was

a causal connection between the protected activity and the adverse employment action. *Morris v. Oldham Cnty. Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000); *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 472 (6th Cir. 2012) (finding the ELCRA retaliation analysis identical to the Title VII analysis.)  Opposition to an apparent Title VII violation is a form of protected activity.  *Wasek*, 682 F.3d at 469.

There is sufficient evidence to establish the first three elements for the purposes of summary judgment.  First, Ms. Hamood opposed ACCESS's face covering policy by complaining to her supervisors and seeking exemption from the policy.  Second, it is undisputed that ACCESS was aware of the complaint.  Finally, Ms. Hamood suffered an adverse employment action when she was terminated.  However, her case falters at the causation element.

To establish a causal connection, Ms. Hamood must "proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *Upshaw v. Ford Motor Co*., 576 F.3d 576, 588 (6th Cir. 2009) (quoting *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir.1997)) (internal quotation marks omitted).  There is no evidence of a causal link between her *complaint* and her termination.  Instead, the evidence universally shows that her termination was the result of her refusal to comply with ACCESS's face covering policy.  No reasonable jury could find that Ms. Hamood's termination

24

was the result of her complaint.  Without a causal connection, the retaliation claim

cannot survive summary judgment.  For that reason, summary judgment on the

relation claims is **GRANTED**.

## IV.    CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Plaintiff's motion for

partial summary judgment (ECF No. 33) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's motion for summary

judgment (ECF No. 34) is **DENIED IN PART** as to the failure to accommodate

claims (Counts I and II) and **GRANTED IN PART** as to all other claims (Counts

III-VIII).

**IT IS FURTHER ORDERED** that that the hostile work environment

(Counts III and IV), disparate treatment (Counts V and VI), and retaliation claims

(Counts VII and VIII) are **DISMISSED WITH PREJUDICE**.

**SO ORDERED.**

s/ Linda V. Parker
LINDA  V. PARKER
U.S. DISTRICT JUDGE

Dated: March 31, 2025