UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SUDOOS HAMOOD,

       Plaintiff,

v.
                               Case No. 23-cv-10270
                               Honorable Linda V. Parker
                               Magistrate Judge Anthony P. Patti

ARAB COMMUNITY CENTER FOR
ECONOMIC AND SOCIAL SERVICES
d/b/a ACCESS, a Domestic Nonprofit Corporation,

       Defendant.
_____/

## OPINION AND ORDER (1) DENYING DEFENDANT'S MOTION TO AMEND ITS WITNESS LIST (ECF NO. 49); (2) GRANTING IN PART AND DENYING IN PART PLAINTIFF'S OMNIBUS MOTION IN LIMINE (ECF NO. 52); AND (3) GRANTING IN PART AND DENYING IN PART DEFENDANT'S OMNIBUS MOTION IN LIMINE (ECF NO. 53)

This is a religious discrimination case arising from Plaintiff Sudoos Hamood's termination from Arab Community Center for Economic and Social Services ("ACCESS"). The matter, currently scheduled for trial on February 10, 2026, is before the Court on: (1) Defendant's Motion to Amend its Witness List (ECF No. 49); (2) Plaintiff's Omnibus Motion in Limine (ECF No. 52); and (3) Defendant's Omnibus Motion in Limine (ECF No. 53). Finding the facts and legal arguments adequately presented in the Parties' filings, the Court is dispensing with oral argument pursuant to Eastern District of Michigan Local Rule 7.1(f).  For the reasons that follow, the Court concludes that:

I.     Defendant's Motion to Amend its Witness List (ECF No. 49) is DENIED;

II.    Plaintiff's Omnibus Motion in Limine (ECF No. 52) is GRANTED IN

       PART AND DENIED IN PART;

III.   Defendant's Omnibus Motion in Limine (ECF No. 53) is GRANTED IN

       PART AND DENIED IN PART.

The Court will address the motions and their arguments in turn.

## **BACKGROUND**

Ms. Hamood, Plaintiff, began working with ACCESS, Defendant, in 2017. In 2021, Ms. Hamood took on a new role at ACCESS and began working as an English teacher during the COVID-19 pandemic.  Shortly thereafter, on October 8, 2021, Ms. Hamood's employment with ACCESS was terminated due to conflict over ACCESS's policy which required English teachers to show their faces while teaching virtually.

### a.  Ms. Hamood's Religious Belief

Ms. Hamood is a practicing Muslim. In March or April of 2020, she began wearing a head covering referred to as a "niqab."[1]  (ECF No. 35-1, PageID.935.) At the same time, COVID-19 mask mandates were in effect.  (*Id.*)  Prior to the

---

[1] A niqab is a garment that covers all portions of an individual's head and face except for their eyes.  It is undisputed that niqabs are worn for religious purposes by some Muslim women. Documents in the record occasionally refer to Ms. Hamood's niqab as a "veil."

pandemic, Ms. Hamood did not wear a niqab while working at ACCESS.  (ECF No. 37, PageID.1797.)

Ms. Hamood asserts that she has a genuine religious belief which requires her to not show her face to men outside of her family.  (ECF No. 39-3, PageID.2268.)  To comply with this belief, Ms. Hamood wears a niqab.  However, Ms. Hamood posed with her face uncovered for the pictures on her 2015-2019 and 2019-2023 ACCESS employee badge and for her 2019-2023 Michigan driver's license.  (ECF No. 34-5, Page ID.524-525.)  ACCESS employees were under the impression that Ms. Hamood wore a niqab in lieu of a face mask and Ms. Hamood said as much to some of her friends.  (ECF No. 35-1, PageID.935.)  Prior to the dispute over the camera policy, Ms. Hamood's coworkers at ACCESS were unaware that Ms. Hamood wore the niqab for religious purposes.  (*Id.*)

### b.  Timeline

The dispute between the parties began on September 4, 2021, when Anisa Sahoubah, the director of the youth and education department for ACCESS, sent an email to Grace Irwin, the supervisor of adult and family learning, informing her that all English teachers must keep their cameras on during virtual classes.  (ECF No. 35-1, PageID.908.)  Ms. Sahoubah stated that the policy was implemented to "keep students engaged, and for students to be able to see how words are

3

pronounced/articulated" and the camera policy was standard practice for "every learning institution" of which she was aware.  (ECF No. 34-7, PageID.698.)

That same day, Ms. Irwin informed all the ESL teachers, including Ms. Hamood, of the policy via text message.  (ECF No. 34-9, PageID.793.)   In response, Ms. Hamood questioned why keeping the camera on during class was important.  (*Id.* at PageID.795, 838.)  Ms. Irwin asserted that it was to "keep students engaged, so they can see how words are pronounced and articulated, and so [Ms. Hamood] could use gestures/props."  (*Id.*)  Ms. Hamood explained that she would keep her camera on but would wear a mask because she did not want her students to screenshot her face.  (*Id.*)  Ms. Irwin then asked if Ms. Hamood could establish a policy where students agreed not to take screenshots, and Ms. Hamood responded that she did not trust that all students would comply, and she was uncomfortable with the idea.  (*Id.* at PageID.839.)  On September 13, 2021, Ms. Hamood met in person with Ms. Irwin and reiterated her discomfort with the policy but did not specifically identify religion as the basis of her objection.  (*Id.* at PageID.804.)

Subsequently, all the ESL teachers, including Ms. Hamood, met with Ms. Irwin and Ms. Sahoubah to discuss the policy.  (ECF No. 35-1, PageID.908.) During this meeting, Ms. Hamood asked what the policy would be if someone wore a niqab.  Either Ms. Irwin or Ms. Sahoubah stated that the situation would be

different for those who wore a niqab, but that such a discussion was irrelevant as

Ms. Hamood was not known to wear one.  (ECF No. 34-9, PageID.806, 814, 845;

ECF No. 35-1, PageID.944; ECF No. 33-1, PageID.262.)

 On September 22, 2021, Ms. Hamood began teaching with her camera on

while wearing a niqab.  (*Id.* at PageID.816.)  Ms. Irwin sent an email confirming

that Ms. Hamood was required to teach with the camera on and her veil off or

ACCESS would move forward with progressive discipline.  (*Id.* at PageID.824.)

Ms. Hamood then raised a religious objection to teaching with her niqab off while

online via email to Ms. Irwin.  (*Id.* at PageID.826.)

Subsequently, Mosein Hussein, ACCESS's Director of Human Resources,

and Ms. Hamood discussed the policy and her objection.  Mr. Hussein explained

that the purpose of the policy was to improve student engagement and having one's

face visible was the best practice for teaching English.  (ECF No. 35-9,

PageID.1108.)  Ms. Hamood reiterated her religious objection and stated that she

was afraid that men outside of her family would see her if she was unveiled while

on zoom, but she was willing to teach with her veil off while in person.  (*Id.* at

PageID.1112.)

Ultimately, on October 8, 2021, Mr. Hussein, Ms. Sahoubah, and Ms. Irwin

met with Ms. Hamood and advised her that she had to remove her niqab while

teaching virtually or she would be terminated from employment.  ACCESS

attempted to identify an alternate position for Ms. Hamood which would allow her to wear a niqab but lacked the funding for such a position.  (ECF No. 35-1, PageID.958.)  Ms. Hamood refused to agree to teach without her niqab and was subsequently terminated.  (ECF No. 34, PageID.301.)

### c.  Educational Best Practices

The parties dispute the impact of viewing a teacher's face on English language acquisition.  In support of her position that face veiling does not violate best practices or impair teaching, Ms. Hamood has provided her deposition and the expert opinion of Dr. William Eggington.  In contrast, ACCESS has provided the expert opinions of Ms. Anita Linder Caref and Dr. Debra Hardison, in addition to the lay witness opinions of Ms. Sahoubah and Ms. Irwin.  ACCESS's witnesses support the proposition that viewing a teacher's face is best practice for English language classes.

Dr. Eggington is a linguist who opined that whatever impact the niqab may have on instruction was "negligible" given the fact that Ms. Hamood's class was taught online and involved teaching grammar and vocabulary at the intermediate level.  (ECF No. 37-10, PageID.2044.)  Dr. Eggington stated that, "all things equal, it's the best model" to teach English with "full facial expression, mouth tongue placement" and that "clear unmuffled vocalization is an optimal way to present language models to a student."  (ECF No. 35-15 at PageID.1652.)  He agreed there

was "no disputing Dr. Hardison's conclusion that facial visual cues play an important role in a student's ability to learn."  (ECF No. 37-10, PageID.2052.) However, Dr. Eggington was skeptical of the benefits gained from viewing the teacher's face due to the fact the course was taught online.  (*Id*.)

Ms. Hamood also points to the textbooks used for the ESL course, which she argues did not require her to show her face.  (ECF No. 33-1, PageID.268.) Furthermore, she points out that there is no evidence of student complaints, decrease in enrollment, or direct evidence of impaired student outcomes because of her face veiling.

Dr. Hardison is also a linguist, and she stated that wearing a niqab was less effective based on the best educational practices.  She acknowledged that there are alternative methods of teaching pronunciation, however, they are less desirable than seeing a teacher's face.  (ECF No. 35-12, PageID.1165-1166.)  She opined that without providing full visual information, Ms. Hamood could not meet all of her students' needs. (*Id.* at PageID.1197.)  Ultimately, Dr. Hardison stated that Ms. Hamood was "bound to be less effective based on best practices" if she did not show her face. (*Id.* at PageID.1200.)

Ms. Caref has a master's degree in English/Language and Literacy from The City College of the City University of New York and extensive experience teaching English.  (ECF No. 37-8, PageID.1914.)  Ms. Caref stated that it "is

crucial for teachers to model correct pronunciation, using explicit facial expressions and mouth positioning." (*Id.* at PageID.1918.)  In Ms. Caref's experience teaching English online, she found it essential for a teacher to model pronunciation and show students her face.  (*Id.* at PageID.1921.)

Ms. Irwin's assessment of Ms. Hamood's teaching was based on her general knowledge and approximately ten minutes of observation of Ms. Hamood's class, during which time she made no assessments as to student engagement.  (ECF No. 34-9, PageID.812.)  However, based on her understanding of educational best practices, Ms. Irwin believed it was better to show your face while teaching.  (*Id.* at PageID.813.)  Ms. Sahoubah also believed having cameras on and showing your face while teaching was best practice for English language acquisition.  (ECF No. 35-1, PageID.939, 946, 953-954.)

## DISCUSSION

### I.   Defendant's Motion to Amend its Witness List (ECF No. 49)

#### a.  The Parties' Arguments

On September 28, 2023, the Court entered a stipulated order extending the deadlines in the Parties' scheduling order, including those governing discovery and witness disclosures. (ECF No. 14 at PageID.105.)  Under the revised order, lay and expert witness lists were due by November 30, 2023, and the discovery cut off was

set for February 16, 2024.[2]  Following the Court's March 31, 2025, opinion and

order on the Parties' cross-motions for summary judgment, Defendant's counsel

learned that Ms. Mona Makki, an employee of Defendant, was aware of data

regarding low vaccination rates in the Yemeni community.  (ECF No. 49 at

PageID.2491.)  Defendant contends that Ms. Makki's testimony would provide the

best available evidence on vaccination rates among the Yemeni community, which

is a population that Defendant serves through its ESL classes.  (*Id.* at 2489.)

Defendant suggests that this testimony would reinforce its position that denying

Plaintiff's request to teach in person was justified because it would have posed a

health and safety risk to Defendant's Yemeni students and staff.  (*Id.* at 2488-89.)

Defendant therefore seeks to amend its witness list to include Ms. Makki, as well

as three custodians of records who would testify to the authenticity of OSHA and

CDC documents Defendant plans to introduce at trial.[3] (*Id.* at 2487, 2509.)

Plaintiff responds that Defendant has not established good cause for its delay

in seeking to add Ms. Makki and the three custodians as witnesses and suggests

that the proposed amendment is "not based on newly discovered evidence, but

rather on strategic reconsideration following the Court's comments in its summary

---

[2] This order served as the Parties' first stipulated amendment to the scheduling order.  The Court later signed a second stipulated order on February 14, 2024, extending the deadline for expert discovery and dispositive motions. (ECF No. 22.)

[3] Defendant believes that the documents qualify as official government reports under FRE 803(8) and should be self-authenticating under 902(5). Defendant requested to add the three custodians to its witness list in the event that Plaintiff challenges the documents' authenticity.

judgment ruling." (ECF No. 51 at 2534.)  Plaintiff further argues that Ms. Makki's proposed testimony is improper because Defendant seeks to elicit "anecdotal observations" and generalized community health trends, including beliefs held within the Yemeni community about COVID and vaccines." (*Id.* at 2537.)

Although Defendant suggests that Ms. Makki may have first-hand experience regarding some of these matters, Plaintiff disputes her ability to testify about data compiled by third parties or to offer opinions on the statistical significance of such data. (*Id.* at 2538.)  Plaintiff further contends that it would be prejudiced by Defendant's amendment, as it would disrupt trial preparation, reopen discovery, and impose an undue burden and expense on Plaintiff. (*Id.* at 2536.)

### b.  Applicable Law & Analysis

Deadlines in a scheduling order may be modified "only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4).  Similarly, Local Rule 16.2(b)(8) states that "except as permitted by the Court for good cause a party may not list a witness unless the witness was included on a witness list submitted under a prior order or has been deposed."  The moving party's diligence in attempting to meet court issued deadlines is the primary measure of the good cause standard. *See Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (internal quotation marks and citation omitted).  "Another relevant consideration is possible prejudice to the party opposing the modification." *Id.*

The Sixth Circuit has adopted the following factors to determine whether a party's late disclosure is substantially justified or harmless:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence.
>> *Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015) (citations omitted).

District courts have broad discretion in applying the *Howe* factors and "need not apply each one rigidly." *Bisig v. Time Warner Cable, Inc.*, 940 F.3d 205, 219 (6th Cir. 2019). Instead, "the factors simply lend [courts] to the task at the heart of Rule 37(c)(1): separating 'honest,' harmless mistakes from the type of 'underhanded gamesmanship' that warrants the harsh remedy of exclusion." *Id.*

Defendant argues that, based on its analysis of the *Howe* factors, good cause exists to amend its witness list to include Ms. Makki and the three custodians of records. The Court disagrees. Applying the *Howe* factors, the Court finds that Defendant's delay was neither substantially justified nor harmless.

First, Defendant's late disclosure was a surprise to Plaintiff. Defendant suggests that "surprise is low because Plaintiff knew from [Defendant's] Answer forward" that it refused Plaintiff's "request to teach in person in part because of the low vaccination rate and low general observance of COVID protocols in the Yemeni community." (ECF No. 49 at PageID.2507.) While Plaintiff may have

11

been aware of this *argument* at early stages in the litigation, nothing suggested that Ms. Makki was the key employee with the relevant knowledge.  By contrast, Ms. Makki, as an employee of ACCESS, has been available to Defendant throughout the course of this litigation.  If community-specific vaccination rates or attitudes were central to Defendant's argument from the beginning, — as Defendant concedes — then Defendant had every opportunity to investigate, identify, and disclose the best available evidence in a timely manner.

While Plaintiff could theoretically cure the surprise—*Howe* factor two—the Court finds that this effort would be extremely burdensome to Plaintiff.  The only way to cure the surprise would be to reopen discovery and permit Plaintiff to depose Ms. Makki.  Defendant suggests that Plaintiff could simply schedule a deposition at a "mutually convenient date and time," but the Court is not persuaded that any such time exists at this stage.  Plaintiff agrees.  (ECF No.51 at PageID.2535-36.)

Moreover, curing the surprise would likely require more than a deposition. Plaintiff may need to identify and prepare its own counter witness to address Ms. Makki's testimony.  The process of taking the deposition, analyzing its contents, and preparing responsive evidence could disrupt and delay trial.

The Court agrees with Defendant that the proposed witnesses are important and could support Defendant's theory of the case.  But the Sixth Circuit has

recognized that the strength and importance of new evidence can "cut both ways." *RJ Control Consultants, Inc. v. Multiject, LLC*, 100 F.4th 659, 670 (6th Cir. 2024). "The more important the proof, the greater the effect of preclusion, but also the greater the harm in tardy disclosure." *Id.*  In light of this guidance, the Court finds that this factor does not meaningfully favor either side.  Although Ms. Makki's testimony may be useful to Defendant, the late disclosure — made only after discovery closed — creates substantial prejudice to Plaintiff.

As for the fifth factor, Defendant asserts that it did not know until after the Court's summary judgment ruling that ACCESS's community vaccination program was directed towards the Yemeni community and that ACCESS relied on that data to support its COVID-related protocols.  (ECF No. 49 at PageID.2508.) The Court is not persuaded that this explanation constitutes a *substantial* justification for Defendant's delay, particularly given that the potential witness was involved in the program and was available to Defendant from the earliest stages of the litigation.

Accordingly, the Court finds that the *Howe* factors weigh in Plaintiff's favor. The Court declines to excuse Defendant's delay and place the resulting prejudice

on Plaintiff.  This Court does not find good cause to allow Defendant to add Ms.

Makki or the custodians of records to its witness list.[4]

The Court **DENIES** Defendant's motion.

## II.   Plaintiff's Omnibus Motions in Limine (ECF No. 52)

Plaintiff's Omnibus Motion in Limine seeks to exclude the following

testimony and evidence: (1) the expert testimony and opinions of Anita Linder

Caref; (2) any witness testimony—lay or otherwise—interpreting Islamic doctrine

or opining on what Islam requires for the purpose of challenging the sincerity of

Plaintiff's religious beliefs; (3) any lay witness testimony regarding "best

practices" in ESL instruction; (4) evidence of Plaintiff's past religious conduct; and

(5) any arguments suggesting that shared religious affiliation precludes

discrimination. (ECF No. 52 at PageID.2540.) The Court will address each sub

motion in turn.

### a.  Legal Standard

District courts have broad discretion over matters regarding the admissibility

of evidence at trial.  *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1218 (6th

Cir. 1987) (citations omitted). "Although the Federal Rules of Evidence do not

explicitly authorize in limine rulings, the practice has developed pursuant to the

---

[4] If the reports are in fact admissible and self-authenticating, the Court encourages the Parties to stipulate to their admission. Otherwise, the Court will resolve this issue at trial.

district court's inherent authority to manage the course of trials." *Luce v. United States, 469 U.S. 38*, 41 n. 4 (1984). "A ruling on a motion in limine is no more than a preliminary, or advisory, opinion that falls entirely within the discretion of the district court." *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994). A court may therefore alter its ruling during trial. *See Luce*, 469 U.S. at 41-42. Courts should rarely grant motions in limine that "exclude broad categories of evidence." *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975).

### b. Application and Analysis

<u>Motion #1: Exclude Testimony of Expert Witness of Anita Caref</u>

On the first motion, which concerns potential expert witness Anita Linder Caref, Plaintiff argues that Ms. Caref is not sufficiently qualified to offer expert testimony because she lacks the requisite experience and knowledge required under Federal Rule of Evidence 702. Plaintiff asserts that Ms. Caref has never been certified as an ESL specialist, has not conducted peer-reviewed research on ESL methodology, and has never before served as an expert witness. (*Id.* at 2542.) Plaintiff also challenges the methodological basis of her opinions, noting that she "conducted no empirical comparison of pedagogical outcomes with or without face coverings" and did not analyze Plaintiff's student's outcomes to assess her effectiveness. (*Id.* at 2543-44.)  Plaintiff also suggests that Ms. Caref's testimony is

duplicative, would not assist the trier of fact, and would be unduly prejudicial. (*Id.* at 2545-47.)

Defendant disputes Plaintiff's arguments and contends that Ms. Caref's education, experience, and specialized knowledge qualify her to testify as an expert. (ECF No. 55 at PageID.2760, 2766-68.) Defendant asserts that Ms. Caref possesses sufficient educational credentials, as she earned a B.S. in Elementary Education with majors in Reading Certification and Bilingual Certification, as well as a master's degree in English/Language and Literacy. (*Id.* at 2760; ECF No. 37-8 at PageID.1914.) Defendant emphasizes that the Sixth Circuit has held that Rule 702 should be interpreted broadly to permit expert testimony when it will assist the trier of fact. (*Id.* at 2729.) Defendant cites language from two Sixth Circuit cases to support the proposition that Plaintiff's challenges relate to Ms. Caref's "credibility, not [her] qualifications to testify." *Id.; Morales v. Am. Honda Motor Co.,* 151 F.3d 500, 516 (6th Cir. 1998); *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916 (6th Cir. 1984.)

Defendant also argues that Ms. Caref's testimony would not be duplicative and would assist the trier of fact. Although Ms. Caref reached the same ultimate conclusion as Defendant's second ESL expert, Dr. Debra Hardison, Defendant asserts that she did so based on her own professional experience rather than on experiments, professional literature, or work with undergraduates. (*Id.* at 2771.) In

16

response to Plaintiff's challenge that Ms. Caref failed to "conduct an empirical comparison of pedagogical outcomes with or without face coverings," Defendant contends that, aside from the controlled experiments conducted by Dr. Hardison, "no one has run a controlled experiment on teaching with a mask because it was never thought to be necessary." *Id.*

Federal Rule of Evidence 702 provides the following guidelines to permit testimony by an expert witness: A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

The Advisory Committee Notes on FRE Rule 702 state the following:

"The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the "scientific" and "technical" but extend to all "specialized" knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by "knowledge, skill, experience, training or education." Thus within the scope of the rule are not only experts in the

17

strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called "skilled" witnesses[.]"

Fed. R. Evid. 702.

The Court **DENIES** Plaintiff's motion to exclude Ms. Caref's testimony and concludes that she is qualified to serve as an expert witness. Ms. Caref had an extensive, 45-year career as an ESL instructor, which provided her with the experience and specialize knowledge necessary to testify about the best practices for teaching ESL students. She has taught students from more than 25 countries — including several Arab countries such as Yemen, Afghanistan, Iran, Iraq, and Syria — and she has also taught in remote-learning environments. (ECF No. 55-3 at PageId.2793.) Her practical experience is complemented by educational credentials that further support her qualification to testify as an expert.

Plaintiff's challenges to Ms. Caref's experience and methodology can be addressed on cross-examination. At this moment, however, the Court finds that her opinions are the product of reliable principles and methods and are based on her education and professional training, decades of experience teaching ESL students, designing curricula, and supervising other ESL instructors.

The Court is not convinced that her testimony will be duplicative. Although she reaches the same conclusion as Defendant's other expert, she does so through a different approach. Her testimony could very well assist the jury by providing an educator's perspective, rather than the more academic or scientific approach.

The Court is persuaded by Defendant's argument that the issues raised by Plaintiff relates more to credibility instead of qualification. What Plaintiff challenges goes to the weight of Ms. Caref's testimony on the stand, not her ability to satisfy the threshold requirements for expert status.

The Court **DENIES** Plaintiff's First Motion in Limine.

Motion #2: Exclude Lay Testimony Interpreting or Opining on Islamic Doctrine

Plaintiff moves to exclude lay testimony that attempts to "interpret, characterize, or opine on Islamic doctrine," including statements about the religious significance of the niqab. (ECF No. 52 at PageID.2547.) Plaintiff advances two primary arguments in support of exclusion. First, Plaintiff contends that such testimony "implicitly questions the sincerity of Plaintiff's beliefs by suggesting that they are theologically incorrect or not required." *Id.* Second, Plaintiff argues that interpreting religious doctrine requires expert qualifications, and Federal Rule of Evidence 701 bars lay witnesses from offering opinions that amount to expert testimony.

Defendant responds that it does not intend to question the sincerity of Plaintiff's beliefs by suggesting that her practice is theologically incorrect or unnecessary. (ECF No. 55 at PageID.2722.) Defendant maintains, however, that its lay witnesses must be permitted to testify about their understanding of the niqab and past accommodations for other niqabis. Defendant also asserts that these witnesses

will need to address "various practical questions involved for those who wear the niqab" and "numerous other subjects involving the niqab." *Id.* Defendant therefore contends that Plaintiff's request is overly broad. *Id.*

The Court is not persuaded that Plaintiff's requested relief is overly broad. Although the motion's heading — "Exclusion of lay testimony regarding Islamic practice or belief" — is broad, the true substance of Plaintiff's request is not. (ECF No. 52 at PageID.2547.) Plaintiff ultimately seeks to exclude lay testimony about what is typical for Muslim women, the religious significance of the niqab, whether the practice is mandatory, and other conclusions that require a witness to interpret or opine on religious doctrine. Defendant intends to call lay witnesses to provide details about Plaintiff's accommodation process, as well as how they have accommodated others with similar requests. Testimony that simply acknowledges that the niqab is a religious face covering, leaving only the eyes visible, is sufficient to show the witness's "understanding of the niqab." The Court is not convinced that the employees' testimony requires doctrinal interpretations.

The Court agrees with Plaintiff that lay witnesses lack the specialized knowledge required to interpret or opine on religious doctrine. Defendant has not designated these individuals as expert witnesses. Accordingly, the Court grants Plaintiff's motion in limine to the extent it seeks to prevent Defendant's lay

witnesses from interpreting, characterizing, or opining on Islamic doctrine or the religious significance (or insignificance) of the niqab.[5]

Accordingly, Plaintiff's Second Motion in Limine is **GRANTED**.

This ruling should not be interpreted to preclude lay witnesses from testifying to factual matters relevant to Plaintiff's sincerity, nor does it bar testimony concerning the factual circumstances of the accommodation process, such as the witnesses' personal observations or reasons for their actions. Testimony on these subjects does not require theological interpretation. Given the sensitivity of the issues and the possibility that certain testimony may approach the limits of permissible lay opinions, the Court encourages the Parties to raise evidentiary objections as necessary. Any concerns will be addressed at trial.

Motion #3: Exclude Lay Testimony of Best Practices in ESL Instruction

In its third motion in limine, Plaintiff seeks to exclude any testimony that characterizes Plaintiff's teaching methods as inconsistent with "best practices" in ESL instruction unless the employee-witnesses are qualified as experts. The Court agrees only in part. The employees may testify as lay witnesses about their personal concerns of Plaintiff's performance and any *beliefs* that informed the termination

---

[5] Defendant has represented that it does not intend to argue that Plaintiff's practice is theologically improper or not required. (ECF No. 55 at PageID.2772.) The record also reflects that Plaintiff has acknowledged that wearing the niqab is "not a must; it's a choice." (ECF No. 47 at PageID.2469.) Given these circumstances, there is no need for lay witnesses to address this issue.

decision. Testimony that the employees viewed Plaintiff's methods as ineffective or inconsistent with the employer's expectations is admissible for the limited purpose of explaining why they ultimately decided to fire her. This testimony does not depend on whether the witnesses' assessment was actually correct, only whether it reflects the reasoning that actually motivated the employment decision.

However, the employees may not offer opinions that purport to explain or define pedagogical standards or otherwise convey specialized or technical judgments about what constitutes "best practices" in ESL instruction. Such testimony would fall within Rule 702 testimony and risk confusing the jury. To avoid this risk, the witnesses must confine their testimony to their own beliefs and judgments and may not present those judgments as authoritative statements.

Accordingly, Plaintiff's Third Motion in Limine is **GRANTED IN PART** and **DENIED IN PART.**

The Court concludes that the witnesses may testify about the reasons for Plaintiff's termination. Their testimony is admissible only to the extent it reflects their personal beliefs. The testimony is excluded to the extent it expresses or implies any professional judgment purporting to state with authority what ESL "best practices" objectively require. They may describe their concerns that informed the termination decision. They may not, however, offer specialized or technical opinions purporting to define the objectively "correct" or "best" pedagogical standards.

Motion #4: Exclude Evidence of Plaintiff's Past Religious Conduct

Plaintiff moves to exclude any evidence, testimony, or argument indicating that Plaintiff has not worn a niqab throughout her entire lifetime. (ECF No. 52 at PageID.2551.) Plaintiff states that the relevant inquiry is whether her beliefs were sincerely held at the time of the alleged discrimination, not whether she held this belief at all points throughout her life. Accordingly, Plaintiff contends that any evidence of past religious conduct is irrelevant and prejudicial.

Defendant responds that such evidence "is directly relevant to the sincerity of Plaintiff's current asserted religious beliefs" and that Plaintiff's requested relief is overly broad. The Court agrees.

Sincerity is a question of fact for the jury. Parties must therefore be permitted to present evidence bearing on that issue, even if the evidence carries some prejudicial effect, because it relates to an essential element of Plaintiff's claim.

Under Federal Rule of Evidence 401, evidence is relevant if it has any tendency to make a fact of consequence more or less probable. Plaintiff's sincerity is an element she must prove, and the challenged evidence bears directly on that question. The Court therefore finds that the evidence is relevant. Rule 403 imposes a demanding standard: relevant evidence is admissible unless its probative value is *substantially* outweighed by a danger of unfair prejudice, confusion, or other listed harms. Here, while the evidence may carry some risk of prejudice to Plaintiff and

may introduce a degree of juror confusion, those concerns do not substantially outweigh its probative value. Accordingly, the Court declines to exclude the evidence under Rule 403.

The Court **DENIES** Plaintiff's Fourth Motion in Limine.

Motion #5: Arguments Suggesting that Shared Faith Precludes Discrimination

Plaintiff moves to exclude any testimony, argument, or suggestion that Defendant or its employees could not have discriminated against Plaintiff because they share the same religion. Plaintiff contends that such evidence should be excluded under Federal Rule of Evidence 401 and 403.

Defendant argues that Plaintiff's motion should be denied because the requested relief is too broad. Defendant also states that it has "no intention of arguing that Muslims cannot discriminate against Muslims due to their religion[.]" Yet, in the same paragraph, Defendant also states that the employees "who made the relevant decisions are Muslim [. . .] they thus are "highly unlikely to discriminate against Muslims[.]" (ECF No. 55 at PageID.2782.) Qualifiers aside, this argument relies on the same premise Plaintiff seeks to exclude.

While Defendant may present evidence supporting its position that Plaintiff was not subjected to discrimination, it may not rely on shared faith to reach that conclusion.  This reasoning rests on a legally incorrect premise, given that Title VII covers intra-faith discrimination. *See Garcimonde-Fisher v. Area203 Mktg.*,

24

*LLC*, 105 F. Supp. 3d 825 (E.D. Tenn. 2015)(recognizing that Title VII covers allegations that an employer favored its own preferred brand of Christianity over employees' differing Christian beliefs); *see also Venters v. City of Delphi*, 123 F.3d 956, 972 (7th Cir. 1997)(recognizing that Title VII prohibits discrimination based on an employer's belief that an employee adhered to the "wrong kind" of Christianity). Accordingly, Defendant is precluded from advancing any argument — directly or indirectly — that relies on shared faith as evidence that discrimination did not occur.

The Court **GRANTS** Plaintiff's Fifth Motion in Limine.

### III.   Defendant's Motion in Limine (ECF No. 53)

Defendant's Motion in Limine seeks to exclude the following: (1) any questions, evidence, or arguments that (a) challenge the validity of any ACCESS COVID-prevention policy that is based on recommendations by public health authorities, or (b) suggests that access should have defied those policies; (2) any questions, comments, or evidence that suggests that ACCESS could have safely reopened its in-person ESL classes in FALL 2021; (3) any questions, comments, or evidence that suggests that ACCESS should have hired new employees or assigned old employees to teach Plaintiff's students; and (4) any lay testimony from Plaintiff about the importance, or lack of importance, of facial gestures in teaching English to Arabic speakers. The Court will address each sub motion in turn.

25

### a.  Legal Standard

District courts have broad discretion over matters regarding the admissibility of evidence at trial.  *Apponi v. Sunshine Biscuits, Inc.*, 809 F.2d 1210, 1218 (6th Cir. 1987) (citations omitted). "Although the Federal Rules of Evidence do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials."  *Luce v. United States, 469 U.S. 38*, 41 n. 4 (1984). "A ruling on a motion in limine is no more than a preliminary, or advisory, opinion that falls entirely within the discretion of the district court."  *United States v. Yannott*, 42 F.3d 999, 1007 (6th Cir. 1994). A court may therefore alter its ruling during trial. *See Luce*, 469 U.S. at 41-42. Courts should rarely grant motions in limine that "exclude broad categories of evidence."  *Sperberg v. Goodyear Tire & Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975).

<u>Motion #1: Exclude (a) challenges to Defendant's COVID-prevention policies and (b) suggestions that Defendant could have defied those policies</u>

Defendant has moved to exclude "any lay questions, comments, testimony, or argument that (a) challenge the validity of Defendant's COVID-prevention policies, or (b) suggest that Defendant should have defied its COVID-prevention policies to accommodate Plaintiff. (ECF No. 53 at PageID.2681-84.) In support, Defendant cites a recent Sixth Circuit decision, *Wise v. Children's Hospital Medical Center of Akron*, and asserts that *Wise* stands for the proposition that "the

26

Court, the jury, and witnesses cannot try to second guess policies based on public health standards" (CDC and OSHA guidelines). *Wise v. Children's Hosp. Med. Ctr. of Akron*, No. 24-3674, 2025 WL 1392209 (6th Cir. May 14, 2025); ECF No. 53 at PageID.2683-84.

Plaintiff responds that the CDC and OSHA guidance on which Defendant relied is advisory, context specific, and expressly contemplates individualized accommodations despite COVID. (ECF No. 56 at 2861-65.) Plaintiff did not directly address Defendant's interpretation or application of *Wise*.

The Court is not persuaded that *Wise* sets a hardline rule barring any inquiry into the reasonableness of an employer's COVID-related decisions, nor is the Court convinced that *Wise* relieves Defendant of its obligation to prove undue burden. First, the Supreme Court of the United States's decision in *Groff v. DeJoy* remains controlling law. *Groff v. DeJoy*, 600 U.S. 447 (2023). Under *Groff*, an employer must demonstrate that accommodating an employee would impose an undue burden that is "substantial in the overall context" of its business. *Groff* at 468. The Sixth Circuit applied this standard in *Wise* and concluded the requested accommodation would impose an undue burden *after* considering the plaintiff's duties, the clinical setting, and the vulnerability of the patient population. *Wise* at *3. This analysis confirms that *Wise* did not hold that reliance on CDC guidance alone resolves the undue burden inquiry.

Second, although the court references CDC guidance in two sections of the *Wise* opinion, the Court is not convinced that these references elevate CDC recommendations to dispositive legal authority, or that they were intended as more than dicta. On the first occasion, the court summarized how the First Circuit approached a plaintiff's suggestion that vaccines were ineffective:

> "The hospital argued that allowing the plaintiff "to work unvaccinated would pose an undue hardship 'by increasing the risk of COVID-19 transmission amongst staff and patients.' " Although the plaintiff's argument against undue burden turned only on whether "the vaccines worked"—a claim the First Circuit rejected because the hospital demonstrated that it relied on guidance from the Centers for Disease Control and Prevention, which stated that vaccines mitigate against "the effects and spread of COVID-19 . . ."

> *Wise* at \*4 (emphasis added).

On the second occasion, the Sixth Circuit responded to the *Wise* plaintiff's argument that the defendant's COVID policies were inconsistent:

> "Plaintiff contends that Defendant's policies were **inconsistent**[.] Plaintiff notes, for example, that vaccinated employees were not required to take tests (despite their continued susceptibility to the virus) and that Plaintiff was not required to take a test for 90 days following her COVID-19 diagnosis (despite still posing a risk due to the infection). **Yet as Defendant points out, the hospital's decision-making process was heavily influenced by the fluctuating recommendations of the scientific community, the changes in government rules and guidelines, and the development and availability of key resources.** What Plaintiff asks, in essence, is for this Court to critically review the hospital's decision-making and determine whether those decisions were thoroughly consistent. That suggestion would require the Court to substitute the health and safety judgment of a hospital facing a rapidly evolving, highly uncertain novel pandemic for that of the Court's own hindsight judgment. Plaintiff does

28

not point to, and we cannot identify, case law that permits the Court to engage in such Monday morning quarterbacking."

*Wise* at *5 (emphasis added).

Defendant suggests that this language establishes a rule that, in any context, once an employer adopts COVID-19 policies informed by CDC recommendations, courts may not second-guess those decisions. But the Sixth Circuit's discussion was directed at a specific argument concerning the consistency of defendant's policies, and the language does not appear to have been material to the court's ultimate determination on undue burden. Nothing in *Wise* indicates that the Sixth Circuit intended to create a sweeping prohibition on courts or juries to bar an assessment of an employer's COVID-prevention policies when those policies are offered as part of an undue burden defense. The Court also notes that *Wise* is an unpublished decision.

For these reasons, the Court **DENIES** Defendant's motion to exclude questions, comments, or testimony that challenges the validity of Defendant's COVID-prevention policies or Defendant's adherence to those policies.

Motion #2: Exclude suggestions that Defendant could have safely opened its in-person ESL classes in Fall 2021

Defendant moves to exclude any questions, comments, or lay testimony suggesting that it was "safe" for Defendant to reopen its ESL classes in Fall 2021.

29

(ECF No. 53 at PageID.2685.) Defendant states that any opinion about the safety of reopening requires expert testimony because reopening decisions depended on assessments of disease progression and other public health considerations. *Id.*

Plaintiff responds that it does not intend to offer medical or epidemiological opinions. Plaintiff states that it will instead present evidence — including Defendant's own admissions — showing that "Defendant could have considered alternative . . . class configurations," along with "factual testimony regarding classroom layout, spacing and scheduling." Plaintiff argues that this evidence falls within the scope of permissible lay testimony under FRE 701. (ECF No. 56 at PageID.2866.)

Because Defendant bears the burden of proving that in-person classes posed an undue burden by increasing COVID-related risks, Plaintiff may rebut that point with non-technical evidence about the physical feasibility of social distancing. However, the Court agrees with Defendant that Plaintiff may not attempt to interpret statistical data, infection rate information, or other metrics concerning the progress of COVID-19, as that testimony requires an expert under Rule 702.

Accordingly, Defendant's motion is **GRANTED IN PART AND DENIED IN PART.** Plaintiff may not offer arguments or lay testimony suggesting that it was "safe" to teach classes in person by interpreting statistics or data, but Plaintiff

30

may present factual evidence and arguments about the feasibility of social distancing.

Motion #3: Exclude questions, comments or evidence suggesting that Defendant could have hired new employees or assigned old employees to teach Plaintiff's students

Defendant moves to exclude any questions, comments, or testimony suggesting that Defendant should have transferred Plaintiff's students to other teachers or hired new employees to accommodate Plaintiff's religious beliefs. (ECF No. 53 at PageID.2687.) Defendant contends that Sixth Circuit case law has established that an employer need not "transfer [a plaintiff's] key job functions" or hire new employees to accommodate a plaintiff's religious belief. *Id.* (citing *Keith v. Cnty. of Oakland*, 703 F.3d 918, 927-28 (6th Cir. 2013); *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 419 (6th Cir. 2021)).

Plaintiff responds that Defendant's reliance on *Keith* and *Wyatt* is misplaced. Plaintiff first points out that the cases on which Defendant relies are disability cases rather than religious accommodation cases. Second, Plaintiff highlights that she, unlike the Plaintiffs in *Keith* and *Wyatt* would not need to "transfer a key job function" to another employee, because "Defendant could have divided her class into smaller sections and [teach] each one herself." (ECF No. 56 at PageID.2869.) According to this line of argument, this specific proposed accommodation would

not necessitate a transfer of essential job functions or require Defendant to hire new employees. The Court agrees.

Plaintiff makes the following argument in her reply brief to her motion for summary judgment:

> "[. . . ] Defendant could have split Plaintiff's class into four separate periods, each with nine (9) students safely social distancing. This solution alone would have accommodated Plaintiff and cost no more than three to four additional hours of **pay to Plaintiff** per week to teach the courses. [. . . ] Defendant failed to consider this proposed accommodation." ECF No. 43 at PageID.2431. (Emphasis added.)

In the Courts view, Plaintiff's suggestion that this accommodation would "cost no more than three to four additional hours of pay to *Plaintiff*" indicates that she was not suggesting that Defendant should hire new employees or transfer Plaintiff's duties to other current ACCESS employees. Indeed, Plaintiff acknowledged this difference in its reply to the present motion:

> "Plaintiff did not seek to eliminate any essential job function. She was fully capable of **teaching English to her students** and proposed a reasonable restructuring of her teaching assignment to accommodate her religious beliefs." ECF No. 56 at PageID.2869.

The Court determines that Plaintiff has not indicated an intent to make the argument Defendant seeks to exclude. Accordingly, Defendant's motion is **DENIED WITHOUT PREJUDICE.** If any issues arise at trial, Defendant may renew its objection.

Motion #4: Exclude lay testimony about the significance of face gestures

Defendant moves to exclude any lay testimony that attempts to offer an opinion on the importance, or lack of importance, of facial gestures in teaching English or Arabic speakers.  Defendant argues that Plaintiff "has no basis for such an opinion" and that this type of testimony should be excluded under FRE 701. The Court agrees. Plaintiff has not stated that she is an expert on this subject, and she is not disclosed as an expert witness. As such, Plaintiff cannot testify affirmatively as to what teaching practices "matter" while providing instruction.

Under Rule 701, a lay witness may offer opinion testimony only if it is based on the witness's personal perception, is helpful to understanding the testimony or determining a fact in issue, and is not based on scientific, technical, or other specialized knowledge within the scope of Rule 702. The rule draws a clear line: lay witnesses may describe what they personally observed, but they may not offer conclusions that require specialized expertise.

To the extent Plaintiff intends to testify to firsthand observations—such as what she saw, believed, heard, or experienced, those statements fall within Rule 701 and will be permitted. However, to the extent Plaintiff intends to testify to scientific conclusions, that testimony constitutes expert opinion and is inadmissible.

Accordingly, the motion is **GRANTED** as to any testimony that offers scientific or technical conclusions and **DENIED** as to testimony that is limited to the witness's personal observations. Counsel may raise proper objections at trial if Plaintiff's comments stray into expert territory. If issues arise, the Court will address them.

## Conclusion

Defendant's Motion to Amend its Witness List (ECF No. 49) is **DENIED**;

Plaintiff's Omnibus Motion in Limine (ECF No. 52) is **GRANTED IN PART AND DENIED IN PART;**

Defendant's Omnibus Motion in Limine (ECF No. 53) is **GRANTED IN PART AND DENIED IN PART**.

**SO ORDERED**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: January 20, 2026